(83 South. 543)

Nos. 22159, 22455.

LATTIMER'S HEIRS v. GULF REFINING CO. OF LOUISIANA et al.

(Dec. 1, 1919.)

*(Syllabus by Editorial Staff.)*

1. REFORMATION OF INSTRUMENTS ⊂⇒13(1)—DESCRIPTION OF THING SOLD MAY BE CORRECTED.

Where the thing intended to be sold and actually sold has not been described correctly, the error may be corrected.

2. EVIDENCE ⊂⇒415—ERROR IN DESCRIPTION OF JUDICIAL SALE MAY BE SHOWN BY PAROL.

Even where the subject of a sale is real estate and the sale is a judicial one, an error in the description of the thing actually sold may be shown by parol.

3. JUDICIAL SALES ⊂⇒53—ERROR IN DESCRIPTION OF LAND SOLD MAY BE CORRECTED.

Before a description of the land sold at judicial sale can be corrected, the court must be entirely satisfied that the property involved in the alleged error was actually the subject of the sale.

4. EXECUTORS AND ADMINISTRATORS ⊂⇒358(2)—SUCCESSION SALE UNDER ORDER OF COURT NOT SUBJECT TO CORRECTION FOR OMISSION OF PARCELS.

Where an administrator's petition for the sale of land and all subsequent proceedings included two 40's not owned by the succession, and the proceedings subsequent to the order of sale omitted two 40's owned by the succession, and the land was not a well-defined body susceptible of identification otherwise than by the government surveys, *held*, notwithstanding subsequent dealings with the land, that the omitted 40's were not sold, and the sale could not be corrected to include them.

Appeal from Twelfth Judicial District Court, Parish of De Soto; John H. Boone, Judge.

Suit by the heirs of Thomas Lattimer against the Gulf Refining Company of Louisiana and others. From a judgment for plaintiffs, defendants appeal. Judgment set aside, and suit dismissed.

Foster, Looney & Wilkinson, of Shreveport, for appellant Gulf Refining Co.

Elmo P. Lee, of Mansfield, for appellant Jos. B. Elam.

Scarborough & Carver, of Natchitoches, for appellees.

PROVOSTY, J. This suit involves the ownership of 50 acres of land constituting the north part of the 80 acres which figure on the map of the United States surveys as the W. ½ of the S. W. ¼ of section 1, township 12, range 12, parish of De Soto. The question is whether this W. ½ of the S. W., ¼ of section 1, was included in a sale made by the administrator of the succession of Ramie De Soto in 1869 to Thomas Lattimer, father of some of the plaintiffs and grandfather of the others, through whom the plaintiffs claim by inheritance. Some of the defendants claim by inheritance from Ramie De Soto, contending that the said W. ½ of S. W. ¼ of section 1 was not included in the sale made to Thomas Lattimer.

The administrator of the succession of Ramie De Soto was Joseph Prudhomme, husband of Mary De Soto Prudhomme, only child and sole heir of Ramie De Soto. This administrator filed a petition, alleging that the succession was in debt, and that—

"There is a tract of land belonging to said succession, there being no other property, described as follows:

"N. E. ¼ of section 12; E. ½ of S. W. ¼ and W. ½ of S. E. ¼ of section 1; W. ½ of S. W. ¼ of section 1; N. E. ¼ of N. W. ¼; N. W. ¼ of N. E. ¼ of section 12, township 12, range 12, containing 349.70 acres."

He prayed that this property be ordered to be sold, and the court made the following order:

"It is ordered that the property belonging to the succession of Ramie De Soto be sold as prayed."

It will be noted that the N. W. ¼ of N. E. ¼ of section 12 is mentioned twice in this de-

scription. Eliminating this error, the description includes the quarter quarter sections, or 40-acre tracts, marked with an X on the subjoined plat:

It will be noted that the description includes 11 40's, and that the area of these 11 40's would be 440 acres instead of 349.70, as stated in the petition. The succession had title to but 9 40's. The two to which the succession had no title are those constituting the S. ½ of the N. E. ¼ of section 12, which are distinguished on the plat by perpendicular lines. Whether these two quarter quarter sections were supposed to belong to the succession is not known.

The clerk of court, in making out the commission to the administrator to make the sale, included these two quarter quarter sections, but left out the two quarter quarter sections constituting the W. ½ of the S. W. ¼ of section 1, which are distinguished on the plat by horizontal lines, the land now in controversy. Whether this was done through error purely or designedly in order to bring down the area to a closer conformity with the acreage stated in the petition and order for sale—from 440 to 360—is not known. The description thus contained in the commission to the administrator to make the sale—that is, with the W. ½ of S. W. ¼ of section 1 left out, and the S. ½ of N. E. ¼ of section 12 included—was repeated in the advertisement of the sale, in the appraisement made by the appraisers for the sale, in the deed which the administrator executed in favor of Thomas Lattimer for evidencing the sale, and finally in the report which the administrator made to the court of the manner in which he had executed the commission given him for making the sale. The advertisement as published was not produced on the trial, but the report of the administrator to the court recites that the land was advertised as described in the report. The land was sold in 40-acre tracts; in other words, each quarter quarter section was sold separately and at so much per acre, to wit, $2.

The contention of the plaintiffs is that the leaving out of the sale the 80 acres which did belong to the succession, and including 80 acres which did not belong, was through error; and they ask that this error be corrected, and that they be decreed to be the owners of the property.

[1-3] There can be no doubt that, where the thing intended to be sold and actually sold has not been described correctly, the

error may be corrected, and that even where the subject of the sale is real estate and the sale is a judicial sale such error may be shown by parol; but before a correction of this kind can be made the court must be entirely satisfied that the property involved in the alleged error was actually the subject of the sale.

[4] Ramie De Soto acquired in 1860, from the United States government, the W. ½ of S. W. ¼ of section 1, and the N. E. ¼ of the S. W. ¼ and the N. ½ of N. E. ¼ of section 12. Now whether he ever acquired the rest of the land embraced in the sale to Lattimer is not shown by the record. Some of this land was cleared and in cultivation at the time of his death, and there was a house on it in which he lived. But not much of a house, we gather, as Lattimer, who had moved into this house after his purchase, proceeded soon afterwards to build himself another house to live in. This De Soto house was not on the W. ½ of S. W. ¼ of section 1; nor, as we gather, was any part of the clearing. This absence of clearing we infer from the fact that when Eleck Jackson acquired the south 30 acres of this W. ½ of S. W. ¼ of section 1, in 1883, he proceeded at once to clearing the land. We are mindful that the witness Wynn locates the De Soto house on this W. ½ of S. W. ¼ of section 1, but on cross-examination he locates it "about half a mile or a little over" from the Mansfield road and to the east of that road, and this road, as shown by the plat offered in evidence by plaintiffs, passed slightly to the east of the center of the W. ½ of S. W. ¼ of section 1. And we are mindful also that the witness Edwards locates the De Soto house on this W. ½ of S. W. ¼ of section 1, but he does it simply because the witness Wynn located it there by making a mark on the plat just mentioned. He says: "Independently of this map, I do not know anything about it." And to the question, "What direction was the old Lattimer house from the Eleck Jackson house?" he answered, "I am not sure about the direction." And to the question as to the distance, he answered, "It seems to me it was about one-quarter from the old Jackson house."

The house built by Lattimer was not on this W. ½ of S. W. ¼ of section 1.

In 1871 the land thus acquired by Lattimer was assessed to him by a description, including this W. ½ of S. W. ¼ of section 1, and not including the S. ½ of N. E. ¼ of section 12. The record does not show whether the land, as a whole, was ever thereafter assessed to any one.

In March, 1877, Thomas Lattimer sold to Mary De Soto Prudhomme, daughter and sole heir of Ramie De Soto, and widow of the Joseph Prudhomme who had been the administrator of the succession of Ramie De Soto, and who, as such, had made the sale to Thomas Lattimer, 150 acres, described in the deed of sale as the N. ½ of N. E. ¼ and N. E. ¼ of N. W. ¼ of section 12, and the south 30 acres of the W. ½ of S. W. ¼ of section 1. The price of this sale was $300 cash, and the sale included, as we gather, the house which Lattimer had built shortly after his acquisition from the succession of De Soto.

Between the date of this sale and April 1, 1879, Lattimer removed permanently to Texas. At the latter date, suit was filed against him as an absentee through a curator, and all the land that had been sold to him at the succession sale of Ramie De Soto was attached, and afterwards sold under a fi. fa., except the N. ½ of N. E. ¼ and the N. E. ¼ of N. W. ¼ of section 12, which he had sold to Mary De Soto Prudhomme. The quarter quarter sections thus seized and sold are those marked with an X on the following plat:

The area sold to Mary De Soto Prudhomme is the part shaded on this plat. It will be noted that the sale to Mary Prudhomme included the south part of W. ½ of S. W. ¼ of section 1, which had not been included in the succession sale, and that the sheriff's sale in the suit against Lattimer included the S. ½ of N. E. ¼ of section 12, which had been included in the succession sale, but did not belong to the succession of Ramie De Soto.

In 1883, Widow Mary De Soto Prudhomme sold to Eleck Jackson, a colored man, for $57, whereof $20 cash, the 30 acres forming the south part of W. ½ of S. W. ¼ of section 1, which Lattimer had sold to her in 1877.

Less than a year before the filing of the present suit, which was in May, 1914, Joseph B. Elam, one of the defendants, took actual possession of the 50 acres constituting the north part of W. ½ of S. W. ¼ of section 1, the land in dispute. This he did under color of a purchase from the widow and heirs of Eleck Jackson. He made an oil and mineral lease to the Gulf Refining Company of Louisiana, another of the defendants. The other defendants are the children and grandchildren of Mary De Soto Prudhomme, who claim by inheritance through her from Ramie De Soto, contending that the W. ½ of S. W. ¼ of section 1 was not included in the sale to Lattimer, and L. R. McGill, who purchased a small part of the land from one of the heirs of Mary De Soto Prudhomme.

As the public records do not show that the succession of Ramie De Soto was ever divested of this W. ½ of S. W. ¼ of section 1, plaintiffs recognize that the heirs of Ramie De Soto are the record owners, and that the title of McGill acquired from one of them is therefore unassailable. And the same thing is to be said of the Gulf Refining Company, who, besides leasing from Elam, has leased from the De Soto heirs. McGill and the Gulf Refining Company are therefore out of the case.

For showing that at the succession sale of Ramie De Soto the parties thought that the property sold included the W. ½ of S. E. ¼ of section 1, the plaintiffs point to the following facts: That the order of the court was for the sale of all the land owned by the succession; that the administrator delivered to Lattimer the patent issued to Ramie De Soto for the W. ½ of S. W. ¼ of section 1, and the N. E. ¼ of the S. W. ¼, and the N. ½ of N. E. ¼ of section 12; that Lattimer in 1871, the first year following the sale, caused this W. ½ of S. W. ¼ of section 1 to be assessed as part of the property owned by him; that in 1877 the daughter and heir of Ramie De Soto bought

from Lattimer a part of this W. ½ of S. W. ¼ of section 1, thus showing that she too understood that Lattimer owned this W. ½ of S. W. ¼ of section 1; that her heirs never laid claim to this land until by the discovery of oil recently it had become very valuable.

The land belonging to the succession of Ramie De Soto did not constitute a well-defined body, with an individuality, like a plantation, or that had repeatedly passed from one owner to another in one body, but was simply lands which the decedent had acquired in part from the government and in part in some other manner not shown by the record in this case, and which were not susceptible of any other identification than by the maps of the United States surveys; and Lattimer was a stranger to the succession, and, for all that appears, may have been a stranger to the neighborhood. When, therefore, he bid at the succession sale he bid on the lands as described in the advertisement of the sale. His intention in buying was to buy the lands thus described.

The sale was made for $150 cash, and two notes of $285 each, secured by mortgage on the property sold. This mortgage, naturally, bore only on the property described in the deed of sale and mortgage. It did not bear on the W. ½ of S. W. ¼ of section 1. It is noteworthy that the certificate of mortgages read at the sheriff's sale, made in the suit against Lattimer in 1879, showed that this mortgage was still uncanceled; or in other words, that the said two notes of $285 each, given by Lattimer for the purchase price of the property had never been paid. It is also noteworthy that this same certificate of mortgages showed a judicial mortgage for $75; another for $8.50, and legal mortgages in favor of the state and parish for the taxes of 1876, 1877, and 1878.

In this suit against Lattimer in 1879 the S. ½ of N. E. ¼ of section 12 was seized and sold as belonging to him, and the price

went towards satisfying his debts. At this sale, by the way, the land brought 66⅔ cents per acre; showing that it was not of any great value.

That Lattimer bought only the lands that were advertised to be sold, that were appraised for the purpose of the sale, and that were actually sold as evidenced by the administrator's deed and his report to the court is certain. How, then, the W. ½ of S. W. ¼ of section 1, not included in this sale to him, came to be assessed to him in 1871 is unexplained, and can only be conjectured. As likely as not the assessor made the assessment in that way because the title of the succession of Ramie De Soto stood that way of record, and Lattimer was known to have been the purchaser at the succession sale of Ramie De Soto. Or, perhaps, after the patent covering, among other lands, this W. ½ of S. W. ¼ of section 1, had been delivered to Lattimer, he found out that it was these two quarter quarter sections which belonged to the succession of Ramie De Soto, and he sought to bring them into the sale as plaintiffs are now seeking to do by laying claim to them and having them assessed to him. The delivery of the patent to Lattimer is not as significant as it might have been if the patent had included only the W. ½ of the S. W. ¼ of section 1, but it included also the N. E. ¼ of the N. W. ¼ and the N. W. ¼ of the N. E. ¼ of section 12; so that Lattimer was as much entitled to the possession of it as any one else.

It was in all probability after this patent had been delivered to him, and he had discovered from it the true situation as to what lands Ramie De Soto owned, that Lattimer lay claim to this W. ½ of S. W. ¼ of section 1. Certain it is that he did lay claim to it, and made the sale of the south 30 acres to Mary De Soto Prudhomme.

Mary Prudhomme was a widow at the time of this purchase. Whether she knew that

the land had ever belonged to her father, or that she had any right to it as heir of her father, does not appear from the record.

If the order of court for the sale of the lands of the succession of Ramie De Soto had not included the S. ½ of N. E. ¼ of section 12, the inclusion of these two quarter quarter sections in the sale and the leaving out of the two quarter quarter sections, constituting the W. ½ of the S. W. ¼ of section 1, could not have been attributed to anything else than to a mere clerical error in description; but the fact is that these two former quarter quarter sections were included in the petition and in the order for sale, and that they and not the other two quarter quarter sections were actually advertised to be sold, and appraised for sale, and actually sold, and that it was on them and not on the other two that Lattimer bid, and that a mortgage was retained for securing the purchase price.

We attach no great importance to the fact that the heirs of Mary Prudhomme have not heretofore laid claim to this land; no more than that the heirs of Lattimer have been equally reticent. It was no doubt the sudden great increase in the value of these lands that led to investigation and the discovery of the rights which are now being urged on both sides.

A significant fact against the plaintiffs is that if this land had been included in the sale made to Lattimer it would have been seized and sold in the 1879 suit against him along with the rest of the land that was thus seized and sold, and these plaintiffs be no better off.

The distinguishing feature between the present case and those cited by the learned counsel for plaintiffs as precedents for it is that in these other cases there was no doubt whatever as to what the contract had been, and the trouble resulted solely from a mere clerical error in the drafting of the deed evidencing the contract; whereas in the instant case the land now claimed by the plaintiffs was not, as a matter of fact, sold to their ancestor.

In Chaffe v. Minden Lumber Co., 118 La. 753, 43 South. 397, the property sold consisted of a town property and a plantation, and the sale was being made for the purpose of effecting a partition of these two properties among the heirs, and both properties were actually sold; but in describing the plantation in his deed the sheriff left out by inadvertence one of the quarter sections composing the plantation. The record left no room whatever for doubt that this quarter section had been sold; and the only real question in the case was as to whether this error in description could be corrected.

In Willis v. Ruddock Cypress Co., 108 La. 255, 32 South. 386, the land was described by name, by boundaries, and by correct acreage; and the only trouble was that in giving the township and range the description had been made to read township 10, range 8; instead of township 10, range 7. There was no doubt whatever as to the identity of the land.

In Bryan v. Wisner, 44 La. Ann. 832, 11 South. 290, the suit was one to compel acceptance of title to a plantation known as Hope Estate Plantation, and the defense was that the description under which the plaintiff had acquired at a foreclosure of mortgage sale, which was by government subdivisions, left out a tract near the center of the plantation. There was no room whatever for doubt that this had been the result of a mere clerical error, and the court held the error to be harmless.

In Vignie v. Brady, 35 La. Ann. 560, two tracts of land had been intended to be sold, and by error a third was included in the sale, and the sole question was as to whether parol evidence was admissible to show the true facts. After this kind of evidence had

been held to be admissible, there could be, and was, no longer any dispute.

Armstrong v. Armstrong, 36 La. Ann. 549, involved, in like manner, solely the question of the admissibility of parol evidence to correct a faulty description of real estate.

In Gladdish v. Godchaux, 46 La. Ann. 1571, 16 South. 451, the sale was of the Utopia Plantation, and part of this plantation had by inadvertence been left out of the description, which was by government subdivisions.

So in Levy v. Ward, 33 La. Ann. 1033, the sale was of a plantation identified by name.

In Penn v. Rodriguez, 115 La. 174, 38 South. 955, the words of the description clearly included the land which by error had not been included in the description by government surveys, and the court allowed the error, of which there was no doubt whatever, to be corrected.

In Palangue v. Guesnon, 15 La. 311, the difficulty was simply as to the admissibility of parol evidence to show that the description had been made to cover the wrong property; there was no doubt as to the error.

Frantom v. Nelson, 142 La. 850, 77 South. 767, involved a private sale of a tract of land of which the vendor had delivered possession to the vendee, and the deed recited that the land sold was the same which the vendor had acquired from his vendor. There was no room for doubt as to the fact that the heirs of the vendor were claiming land which their ancestor had parted with title to.

So Metcalfe v. Green, 140 La. 950, 74 South. 261, was decided upon its peculiar facts. These are too voluminous and complicated to be stated here. Suffice it to say that the case is not analogous with the present.

In Garrett v. Spratt, 131 La. 707, 60 South. 199, by error the patent which was issued called for the N. E. ¼ of section 4, instead of the S. E. ¼. The patentee sold and delivered the land by the same erroneous description. Thirty-nine years later, and many years after the patentee had parted with the title, the error was discovered and was corrected by the issuance of a new patent in the name of the original patentee. The first patent was void because the land which it covered had already been patented to some one else. The heirs of the patentee claimed title under the second patent; and the court, as a matter of course, held that the second patent was a mere correction of the first.

Coleman v. Thibodaux, 119 La. 474, 44 South. 269, was decided on its peculiar facts, bearing no analogy with the present case, except that a deed was corrected so as to conform with the express agreement of the parties.

In all these cases after parol evidence had been admitted there was no doubt as to what had been the contract of the parties. In the present case the land was sold by 40's at so much per acre, and the two 40's in question were not sold, they were not appraised to be sold, they were not advertised to be sold, and were not actually sold.

The judgment appealed from is set aside, and it is now ordered, adjudged, and decreed that the suit of plaintiffs be dismissed, at their cost in both courts.